[Civ. No. 314.   Fifth Dist.   Mar. 19, 1964.]

FRED KENNEDY, Plaintiff and Appellant, v. LOU REECE et al., Defendants and Respondents.

720

Donahue & Hastin for Plaintiff and Appellant.

Milton Wichner for Defendants and Respondents.

CONLEY, P. J.—This is an appeal by the plaintiff from a judgment adverse to him on his complaint and favorable to the defendants on their counterclaim. The plaintiff, Fred Kennedy, made a contract with Reece and Thomas, mining partners, to drill a water well for them; the agreement, on the letterhead of the Fred Kennedy Company, reads as follows:

"We propose to furnish all materials and perform all labor necessary to complete the following:

"drill 12" hole to estimated depth of 400'     3.50 per ft. case with new 6" well casing with bottom half perforated gravel pack, wash well and bail.     1.50 per ft.

"All of the above work to be completed in a substantial and workmanlike manner according to standard practices for the sum of two thousand Dollars ($2,000.00)

"Payments to be made $1,000.00 on signing this agreement bal when cased_____ $_____ as the work progresses to the value of_____ per cent (_____%) of all work completed. The entire amount of contract to be paid within _____ days after completion.

"Any alteration or deviation from the above specifications involving extra cost of materials or labor will only be executed upon written orders for same, and will become an extra charge over the sum mentioned in this contract. All agreements must be made in writing.

"Respectfully submitted,
FRED KENNEDY Co.
Drilling and Sewer Contractors
By: /s/ Fred Kennedy"

An acceptance is endorsed by Lewis H. Reece and Steven Thomas.

The complaint alleges with respect to the contract: "That on or about the 31st day of March, 1961, plaintiff and defendants entered into a written contract wherein plaintiff agreed to drill for defendants certain water well at an estimated

cost of Two Thousand Dollars; that after commencing drilling operations it was determined that it was not possible to obtain water in the area selected by defendants, hence, by mutual agreements the parties discontinued drilling operations, at which time there was due to plaintiff the sum of Four Hundred Dollars, demand for which has been made and no part of which has been paid.''

The answer and counterclaim avers, on the contrary, that the agreement was to drill a 12-inch hole for a water well to an estimated depth of 400 feet, case it with new 6-inch well casing with the bottom half perforated, and further to gravel pack, wash and bail the well for a fixed price of $2,000, payable $1,000 upon execution of the contract and the balance when the casing was installed; that the sum of $1,000 was paid upon the execution of the contract and that plaintiff ''failed and refused to perform the contract and breached the same and after abandoning one hole at a depth of 130 feet, commenced a second hole, which he abandoned at 270 feet, and failed and refused and continues to fail and refuse to drill a hole to the depth of 400 feet and case the same.'' The pleading further alleges that the two holes in question were placed at points selected by the plaintiff as most likely to yield water; that plaintiff breached the contract by failing and refusing to complete the well; that the two holes in the ground have no value; that at the time the contract was entered into the plaintiff knew that the defendants required the well for the purpose of supplying water for their gold mining and milling operations. The counterclaim sets forth items constituting the alleged damages as follows:

''That as a direct and proximate result of plaintiff's breach of contract, defendants sustained the following damages:

1. Cost of installing pump, motor and pipe line
   in the well on the property of a third person ...$1380.64
2. Additional cost of heavier pump .............$ 900.00
3. Cost of recapping abandoned holes ...........$ 200.00
4. Down payment ...........................$1000.00
5. Loss of four months profit from gold
   mill operation ..........................$12,000.00

all to defendants' damage in the sum of $15,480.64.''

The cause was tried by the court sitting without a jury, and resulted in a judgment for the defendants on their counterclaim in the sum of $1,307.15, besides interest and costs.

The findings generally support the theory pleaded by the

defendants. The court expressly found that the allegations in the complaint as to the contract were not true, and that the averments in the answer relative to the agreement are true except with respect to damages, as to which it is held:

"That as a direct and proximate result of plaintiff's breach of contract, defendants sustained the following damages:

1. Increased cost of Pump .......... $1062.80
2. Electrical Work ................. 290.15
3. Plastic pipe & fittings ........... 877.01

As set forth in defendants' Exhibit F:

1. Pumping plant panel & labor..... 208.62
2. One new #43 Hi Lift Stator only. 83.57
3. One Penn Control Switch ........ 25.00

Total ................................. $2547.15

Less

1. Labor saved by using plastic pipe .......................... $ 240.00
2. Balance on contract with plaintiff ...................... $1000.00

Total ........................ $1240.00

Defendants' damages are the difference ........ $1307.15"

The evidence shows that Mr. Kennedy was an experienced water well driller carrying on his trade in the area; that he assured Mr. Reece that he was certain of getting an acceptable well and that there would be no trouble in reaching the 400-foot level contemplated by the written contract. However, the first hole drilled by the plaintiff, after being carried to a depth of 130 feet, was abandoned at the instance of the appellant because he claimed that he had struck hard rock. The plaintiff told Mr. Reece that he would move, without charging him any additional sum, to a new point on the land of a neighbor, if Mr. Reece would dig a sump hole at the proposed location and construct a passable roadway to the place where the well was to be drilled. The defendants accordingly secured permission to drill the well on the neighbor's property, and the second hole was carried down to a depth of 270 feet; Mr. Kennedy claimed that he there struck the same hard formation, which he said was granite but which the evidence on behalf of the defendants showed was a relatively brittle rock that could be drilled through. Mr. Kennedy removed his equipment without any preliminary notice to defendants and left the area; he did not complete the well, and he did not insert any casing or cap either of the holes. No consent was given by Mr. Reece for the abandonment of the operation by

Kennedy. In this respect as well as in others, there was a conflict in the testimony, but, of course, the trial court's findings, being sustained by substantial evidence, must prevail.

The defendants did not complete the well, although the evidence indicates that two contractors stated to Mr. Reece that they would be willing to drill to the 400-foot level at a cost estimated at $5.00 per foot, besides the necessary expense of setting up and taking down their equipment. The defendants arranged with their neighbor to use, in their gold-mining operations, an existing well, which was located some 4000 feet away; they connected this source of water with their mining area by a plastic pipeline and the installation of a pump of greater capacity than they would have had to use if the well drilled by plaintiff had been successful. The mining property required water for the processing of the gold, and it is claimed by defendants that a delay of approximately four months, which resulted from the failure of their hoped for source of water through Kennedy's default, caused them damage. The court, as above noted, did not make any award for the delay in carrying on their mining work, but it did give them damages for the additional cost of the pump, electrical work, plastic pipe and fittings, a pumping plant panel and labor with respect to installation, a stator, and a control switch amounting in all to the sum of $2,547.15, less an item of labor saved by the use of the plastic pipe amounting to $240 and the balance of $1,000, which would have been paid to the plaintiff had he completed his contract. This total deduction of $1,240 left a figure of $1,307.15 as the net damages allowed by the court.

## What Was the Meaning of the Contract?

■ The trial court correctly construed the contract. By it, the plaintiff agreed to drill a 12-inch hole to an estimated depth of 400 feet, to install new 6-inch well casing with the bottom half perforated, to gravel pack and wash the well and to bail it for the sum total of $2,000, $1,000 of which was to be paid upon the signing of the agreement and the balance upon the full completion of the work. In the right margin of the contract, there are figures indicating that the basis for estimating the total contractual price was at the rate of $3.50 per foot for the drilling and $1.50 per foot for the casing, but these figures do not change the meaning of the contract as already stated. ■ It should be noted, however, that nowhere in this contract is there an express undertaking that

the plaintiff would secure water in any given quantity or drill a producing well or complete construction before a specified date, and these negative factors are important in a consideration of the award of damages.

■ There is no implied agreement in a contract to dig a water well as to the quantity or quality of the water to be procured, or even that any water will be produced (17A C.J.S., Contracts, § 494 (2), pp. 716-718). ■ But a contract to drill a well to a specified depth is not fully performed until that depth is reached (*Fessman* v. *Barnes* (Tex. Civ.App.) 108 S.W. 170).

### Did the Plaintiff Perform His Contract?

■ It is obvious that the finding that the plaintiff failed to comply with the terms of his contract is supported by substantial evidence; the well driller did not dig the well to a depth of 400 feet; he did not case it; he did not gravel pack, or wash, or bail it. Appellant contends, however, that he was relieved from the duty of completing his contract because of "impossibility" resulting when he hit hard rock at the 270 foot level.

The enlargment of the meaning of "impossibility" as a defense, (which at common law originally meant literal or physical impossibility of performance) to include "impracticability" is now generally recognized (6 Williston on Contracts (rev.ed.) § 1931, pp. 5407-5411). In the leading California case approving this expanded meaning, *Mineral Park Land Co.* v. *Howard*, 172 Cal. 289 [156 P. 458, L.R.A. 1916F 1], the court accepted the defense of impracticability in an action which involved a contract to take all gravel necessary to effect the construction of a fill and complete the cement work on a proposed bridge when the evidence showed that the defendant used all gravel that was available except submerged gravel, the cost of the extraction of which would have been ten or twelve times the cost of removing the surface gravel. ■ As is said in 6 Corbin on Contracts, section 1325, page 338: "A performance may be so difficult and expensive that it is described as 'impracticable,' and enforcement may be denied on the ground of impossibility." (See *City of Vernon* v. *City of Los Angeles*, 45 Cal.2d 710, 719 [290 P.2d 841]; 12 Cal.Jur.2d, Contracts, § 238, pp. 461-462.) However, this does not mean that any facts, which make performance more difficult or expensive than the parties anticipated, discharge a duty that has been created by the contract (Rest., Contracts, § 467, pp. 882-884). ■ Facts

which make performance harder or more costly than the parties contemplated when the agreement was made do not constitute a ground for the successful interposition of the defense of "impracticability" unless such facts are of the gravest importance. If it be noted that this is merely a difference of degree rather than a difference in kind, such notation is accurate.

In *Snow Mountain W. & P. Co.* v. *Kraner*, 191 Cal. 312, 324-325 [216 P. 589], it is said: "Appellant was not absolved from his contract by the natural obstacles intervening, unless they rendered performance practically impossible. Mere difficulty, or unusual or unexpected expense, would not excuse him. (*Carlson* v. *Sheehan*, 157 Cal. 692, 697 [109 P. 29].)"

█ Principles applicable to the present case are thus stated in *Wilson* v. *Alcatraz Asphalt Co.*, 142 Cal. 182, 188-189 [75 P. 787]: "The rule is, that if performance of a contract is possible, it is none the less a breach, although the obligor himself may have become wholly unable to perform.

█ The impossibility must consist in the nature of the thing to be done, and not in the inability of the party to do it. █ If what is agreed to be done is possible and lawful, it must be done. Difficulty of accomplishing the undertaking will not avail the party who commits a breach of the contract. █ If a party expressly undertakes to do a thing lawful in itself, and not necessarily impossible under all the circumstances, and does not do it, he must make compensation in damages, though the performance was rendered impracticable, or even impossible, by some unforeseen cause for which no provision is made and over which he had no control, but against which he might have provided in his contract. The rule has its foundation in common sense and honesty, and compels parties to abide by their contracts. Any other rule would leave all contracts in a sea of uncertainty without rudder or compass."

That increased difficulties and heightened costs of a reasonable nature, even though originally unforeseen, do no render the performance of a contract "impracticable" is illustrated by the following California cases: *Coulter* v. *Sausalito Bay Water Co.*, 122 Cal.App. 480 [10 P.2d 780]; *Orr* v. *Forde*, 101 Cal.App. 694, 702 [282 P. 429]; *Glens Falls Indem. Co.* v. *Perscallo*, 96 Cal.App.2d 799 [216 P.2d 567]; *Metzler* v. *Thye*, 163 Cal. 95, 98 [124 P. 721]. For example, if a contractor agrees to build a structure and it is destroyed by fire or other casualty when only partly completed, the con-

tractor is not relieved from his duty to rebuild merely because of the additional expense he must incur or the added difficulties he must overcome. (*Gray* v. *Bekins,* 186 Cal. 389, 395 [199 P. 767]; *Ahlgren* v. *Walsh,* 173 Cal. 27 [158 P. 748, Ann. Cas. 1918E 751]; *Keeling* v. *Schastey & Vollmer,* 18 Cal.App. 764 [124 P. 445]; *Carlson* v. *Sheehan,* 157 Cal. 692 [109 P. 29].)   To the same general effect are the following cases: *Holt Manufacturing Co.* v. *Thornton,* 136 Cal. 232 [68 P. 708]; *Pope* v. *Farmers' Union etc. Co.,* 130 Cal. 139 [62 P. 384, 80 Am.St.Rep. 87, 53 L.R.A. 673]; *Ryan* v. *Rogers* 96 Cal. 349 [31 P. 244]; *Dorn* v. *Goetz,* 85 Cal.App.2d 407 [193 P.2d 121]; *McCulloch* v. *Liguori,* 88 Cal.App.2d 366 [199 P.2d 25]; *Aristocrat Highway Displays, Inc.* v. *Stricklen,* 68 Cal.App.2d 788 [157 P.2d 880]; *Lloyd* v. *Murphy,* 25 Cal.2d 48 [153 P.2d 47]; *Hein* v. *Fox,* 126 Mont. 514 [254 P.2d 1076].)

█  In the present case, neither the pleadings nor the facts as found by the court warrant the application of the doctrine of impossibility, or impracticability.  █  If a pleader in a contract action depends upon performance by him, he should so allege, or if, in the absence of performance by him, he relies in whole or in part upon waiver, impossibility, impracticability or frustration, he should allege such facts in his pleading. (*Daley* v. *Russ,* 86 Cal. 114 [24 P. 867]; *Estate of Warner,* 158 Cal. 441 [111 P. 352]; *Eucalyptus Growers Assn.* v. *Orange County N. & L. Co.,* 174 Cal. 330 [163 P. 45]; *Kirk* v. *Culley,* 202 Cal. 501, 506 [261 P. 994]; *Martin* v. *Chernabaeff,* 124 Cal.App.2d 648, 655 [269 P.2d 25]; *Swanson* v. *Thurber,* 132 Cal.App.2d 171, 181 [281 P.2d 642]; 12 Cal.Jur.2d, Contracts, § 227, pp. 450-451; 17A C.J.S., Contracts, § 574, pp. 1105-1107.) But this was not done.

█  More important still, the findings do not establish, but actually negate, the necessary basis for a defense of impracticability. The plaintiff testified that it would be almost impossible and extremely expensive to drill through the rock formation at the 270-foot level, but the defendants' testimony indicated that the rock encountered by the drill was not so hard a formation as plaintiff claimed and inferentially that, with some increased difficulty, it could be pierced. The evidence also showed that two other drillers had expressed to defendants a willingness to complete the well to the 400-foot level and that a charge of $5.00 per foot besides the cost of moving the drilling equipment would be adequate. Every in-

tendment is in favor of the judgment, and the court's findings on controverted issues, if supported as here, by substantial evidence must be accepted. It is clear, therefore, that the necessary factual basis for a successful plea of impracticability was not present.

### WHAT IS THE MEASURE OF DAMAGES ON THE COUNTERCLAIM?

▉ Doubtless misled by the detailed statement of damages contained in the counterclaim, the court erred in allowing damages as set forth in the findings. The contract did not provide that the well would produce any water at all. To base a finding of damages on the increased cost of installing an enlarged pump on a different well and building a longer pipe line to the mine of the defendants was patently erroneous.

▉ The proper measure of damages is the difference between the contract price and the greater cost of drilling and completing the well in accordance with the contract; the trial court should ascertain the reasonable cost of completing the drilling of a 12-inch hole to a depth of approximately 400 feet, installing 6-inch casing with the bottom half perforated, gravel packing, washing, and bailing it, deduct therefrom the contractual balance of $1,000, and award damages on the counterclaim accordingly. (Civ. Code, § 3300; *Higgins* v. *Grant,* 111 Cal.App. 351, 358 [295 P. 532]; *Wallace* v. *Ah Sam,* 71 Cal. 197 [12 P. 46, 60 Am.Rep. 534]; *County of Los Angeles* v. *Margulis,* 6 Cal.App.2d 57 [44 P.2d 608]; *Allen* v. *Gardner,* 126 Cal.App.2d 335 [272 P.2d 99]; 14 Cal.Jur.2d, Damages, § 144, p. 774.)

The judgment is reversed only as to the damages awarded on the counterclaim with directions to the trial court (1) to permit the defendants upon application to amend their counterclaim as to damages, and (2) to retry the case with respect only to damages on the counterclaim; the judgment is otherwise affirmed.

Brown (R. M.), J., and Stone, J., concurred.